**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Phillip RAMSEY, Jr., Defendant–**
**Appellant.**

No. 91–9055.

United States Court of Appeals,
Eleventh Circuit.

May 28, 1993.

---

Lynn Fant, Federal Defender Program, Inc., Atlanta, GA, for defendant-appellant.

Sandra E. Strippoli, Asst. U.S. Atty., Atlanta, GA, for plaintiff-appellee.

Before COX and DUBINA, Circuit Judges, and GODBOLD, Senior Circuit Judge.

DUBINA, Circuit Judge:

Appellant Phillip Ramsey ("Ramsey") was convicted of knowingly possessing with intent to distribute more than 100 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1). He appeals his conviction on the grounds that (1) the district court erred in admitting his custodial statements into evidence because they were made involuntarily and the investigating officers violated his Fifth Amendment right to remain silent and (2) the district court abused its discretion in striking the testimony of a witness. In addition, Ramsey appeals his sentence on the basis that the district court erred in refusing to hold an evidentiary hearing on his claim that the United States Sentencing Guideline ("U.S.S.G.") provisions for cocaine base are unconstitutional under the Due Process and Equal Protection Clauses of the United States Constitution. Because we hold that the district court erred in admitting Ramsey's custodial statements, we reverse his conviction. For that reason, we need not address Ramsey's other assignments of error.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

While watching passengers deplane from an incoming flight from Detroit, Michigan, at Hartsfield International Airport in Atlanta, Georgia, Drug Enforcement Administration ("DEA") Task Force Agent ("TFA") Vicki Prattes ("Prattes") noticed Ramsey because he was wearing a bright orange suit. She then noticed a small, unnatural bulge slightly below Ramsey's waist underneath his pants. Based on her observations and other information Prattes had obtained about Ramsey, she approached him, identified herself as a police officer and attempted to interview him.

After asking a few questions and noticing that Ramsey appeared to be nervous, Prattes requested consent to search him. Ramsey consented. Prattes then asked whether he had a preference between being searched at their present location near the gate or in a

private area. Ramsey responded that he had no preference, so Prattes took him to a small room next to the gate area with TFA Wayne Scott Perry ("Perry") following. Prattes entered the room and waited for Ramsey to follow. Instead, he turned and came face-to-face with Perry. Ramsey asked Perry if he was with Prattes, and Perry responded that he was. Ramsey stated that he had to throw a few things away and began putting items in a trash can. He then shoved Perry and ran down the concourse. Prattes, Perry and several other agents in the area gave chase.

Upon reaching the middle of the concourse, Ramsey went down an escalator to the transportation mall, which contains a walkway and train that connect the concourses. The agents lost sight of Ramsey for about three minutes until TFA J.J. Stubbs ("Stubbs") noticed a face peering through a window in an emergency exit door. Stubbs went through the door and was confronted by Ramsey. Stubbs struck Ramsey twice with an open hand in the course of taking him into custody.

Perry arrived on the scene and located a plastic bag containing over 110 grams of crack cocaine twenty-five to ninety feet away from Ramsey. Perry found the drugs behind a second alarm door at the end of a hallway leading off the room where Ramsey was found. No one else was present in that area at that time. In addition, the bulge Prattes had observed initially on Ramsey was no longer present, and the bundle of crack cocaine found was consistent with the size of the bulge.

Stubbs and Perry took Ramsey to the airport DEA office, reading him his *Miranda* [1] rights along the way. Ramsey verbally acknowledged that he understood his rights. Showing Ramsey the bag of crack cocaine, Perry asked him if it was his. Ramsey replied that he had never seen it before. No further discussion took place at that time.

Shortly thereafter, after retrieving the items Ramsey had earlier thrown into the trash can, Prattes arrived at the DEA office. She remarked to Ramsey that he thought he could get away but he got caught. Because Prattes had initiated the investigation of Ramsey, she was considered the agent in charge of the case. Prattes read Ramsey his rights and asked him if he understood. Although he did not respond at first, he stated that he understood after she asked him to respond verbally. Prattes then asked Ramsey if he wanted to make a statement. Ramsey looked at her and looked away.[2] Prattes and the other agents, including TFA Joel Jordan ("Jordan"), understood Ramsey's response to mean that he did not want to talk to Prattes and asked him no further questions at that time.

---

1. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. During the direct examination of Prattes at trial she testified that "he said no" when she initially asked him if he wanted to make a statement. During her cross examination at trial, however, she testified that he looked at her and looked away. Additionally, TFA Joel Jordan, who was present in the DEA office at the time, testified during his direct and cross-examination at trial and his cross-examination at the hearing to determine the admissibility of Ramsey's custodial statements, see *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), that Ramsey ignored Prattes when she asked him if he wanted to make a statement.

While Ramsey's negative verbal response to Prattes' question would be a clear invocation of his right to remain silent, Ramsey made no objection to the admission of the statements after Prattes testified that "he said no" when she asked him if he wanted to make a statement. Since Ramsey did not object to the admission of the statements after Prattes gave this testimony, the admission of the statements in light of this testimony is subject to the plain error standard of review. The district court did not commit plain error in admitting the statements in light of this testimony because the great weight of the evidence, including testimony from Prattes, is that Ramsey's response was not a verbal "No," but rather that he looked at Prattes and looked away.

Since the district court did not commit plain error in admitting the statements in light of Prattes' testimony at trial that "he said no" and there was no additional evidence presented at trial that would be a basis for plain error, we must evaluate the district court's decision to admit the statements at the point when Ramsey made his objection to their admission: at the end of the *Jackson v. Denno* hearing. At that point, the only evidence before the court regarding Ramsey's response to Prattes's initial inquiry about whether he wanted to make a statement was that Ramsey looked at Prattes and then looked away.

Prattes then asked Jordan to take Ramsey into a separate room to search him. After Jordan concluded the search, he explained to Ramsey that he should be truthful about the situation, that he should not do someone else's time, that he should answer the questions the officers ask him and that this was his opportunity to help himself. Jordan explained to Ramsey that based on the quantity of narcotics found coupled with a prior felony conviction, he would serve ten to forty years in prison if convicted. Jordan went on to explain that Ramsey would be prosecuted under the federal system and under the federal system the length of sentence is fully served. Jordan then told Ramsey that he would explain the extent of his cooperation to the United States Attorney's Office.

Ramsey waited for a moment and then stated, "It's bigger than you think, it's deeper than it appears to be." Jordan asked him to explain. When Ramsey started speaking, Jordan interrupted him and asked TFA Rick Webster to join them to witness the statement. After Webster entered the room, Ramsey stated that he had obtained the crack cocaine from Dewayne Smiley in Detroit and that he was to take $5,000 to Smiley to pay for the crack cocaine. Ramsey then provided a description of Smiley, his address and a description of his car. Ramsey stated that he had planned on distributing the crack cocaine in the Eastman, Georgia, area. He made these statements twenty to thirty minutes after Prattes had initially asked him if he wanted to make a statement.

Jordan then returned with Ramsey to the office area and seated him in a chair. After learning that Ramsey had given a statement to Jordan, Prattes asked Ramsey if he would talk to her. Again, Ramsey looked away and ignored her. Jordan came over a few minutes later and asked Ramsey to accompany him into the other room. In the other room, Jordan and Webster explained to Ramsey that the case belonged to Prattes, that Ramsey needed to give her the same information he gave them and that it was in his best interest to tell the truth about the whole situation. Ramsey then told Prattes essentially the same information he had told Jordan and Webster. None of the information that Ramsey gave to the agents could be confirmed.

### B. *Procedural History*

A federal grand jury indicted Ramsey, charging him with knowingly and intentionally possessing with intent to distribute more than 100 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1). Prior to trial, the district court held an evidentiary hearing to determine the admissibility of Ramsey's statements as required by *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Evidence at the hearing indicated that Ramsey had prior experience with the criminal justice system, having been arrested four or five times in California. After hearing the evidence, the district court found the statements made by Ramsey after his arrest admissible because they were voluntarily made.

At trial, the district court excluded the testimony of a defense witness when defense counsel continued questioning the witness about a subject the district court had instructed him to stop pursuing. The district court did not strike the testimony of two prior witnesses who had testified about the same subject.

Following the jury's guilty verdict, Ramsey filed a motion to have the sentencing provisions of 21 U.S.C. § 841(b)(1)(A)(iii) and U.S.S.G. § 2D1.1 declared unconstitutional as to cocaine base under the Equal Protection and Due Process Clauses of the United States Constitution. In the alternative, Ramsey requested that the court hold an evidentiary hearing so that he could substantiate his claim that the sentencing provisions dealing with crack cocaine violate the Equal Protection Clause. The district court denied the motion.

The district court sentenced Ramsey to 151 months imprisonment and five years of supervised release. Ramsey then perfected this appeal.

## II.  ANALYSIS

Ramsey contends that his custodial statements were erroneously admitted at trial both because they were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86

S.Ct. 1602, 16 L.Ed.2d 694 (1966), and because they were involuntary. Because we hold that the statements were admitted in error for the first reason, we need not address the second reason.

█ The *Miranda* violation occurred when Jordan continued to interrogate Ramsey after he had equivocally invoked his right to remain silent by looking at Prattes and then looking away when she initially asked him if he wanted to make a statement.[3]

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to questioning, that he wishes to remain silent, the interrogation must cease. At this point, he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

*Id.* 384 U.S. at 473–74, 86 S.Ct. at 1627. One way an individual can invoke his right to remain silent is by refusing to speak. *See, e.g., Jacobs v. Singletary*, 952 F.2d 1282, 1292–93 (11th Cir.1992) ("by repeatedly refusing to speak at all to [the officer], even to the point of not giving her name, [the suspect] provided at least an equivocal or ambiguous indication that she wished to remain silent"); *United States v. Hernandez*, 574 F.2d 1362, 1369 & n. 9 (5th Cir.1978);[4] *United States v. Montana*, 958 F.2d 516, 518 (2d Cir.1992); *United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir.1988). Although we have found no case in which a suspect's silence in response to a single question was held to be an invocation of his right to remain silent, we find it significant that the agents here interpreted Ramsey's action of looking away after Prattes asked him if he wanted to make a statement as indicating that he did not want to talk to Prattes. At that time, the agents had no way of knowing whether Ramsey did not want to talk to agents other than Prattes. Ramsey's refusal to speak with Prattes was at least an equivocal invocation of his right to remain silent because he indicated in some manner that he did not wish to speak.

█ Once a suspect has equivocally indicated that he wishes to remain silent by refusing to speak, an investigator may ask questions designed only to clarify whether the suspect indeed wishes to remain silent. *Jacobs*, 952 F.2d at 1293 ("Although [the investigator] may have been unsure whether [the suspect] was indicating that she desired to remain silent, he was only entitled to clarify whether she wished to remain silent."); *see also Christopher v. Florida*, 824 F.2d 836, 841–42 (11th Cir.1987), *cert. denied*, 484 U.S. 1077, 108 S.Ct. 1057, 98 L.Ed.2d 1019 (1988). For a significant period of time after a suspect has exercised his right to remain silent, whether unequivocally or equivocally, "the police must refrain from questioning [the suspect] unless the suspect both initiates further conversation and waives the previously asserted right to silence."[5] *Jacobs*, 952 F.2d at 1293 (quotations omitted). Impermissible interrogation includes both express questioning and words or actions by the police "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980) (footnotes omitted).

█ In this case no agent clarified with Ramsey whether his silence meant only that

---

**3.** Although the government argues that Ramsey did not argue to the district court that he equivocally invoked his right to remain silent when Prattes initially asked whether he wanted to make a statement, we disagree. At the *Jackson v. Denno* hearing, defense counsel argued among other things that Ramsey "indicated he did not want to speak with [Prattes].... You could look at it that his silence was an equivocal statement that he didn't want to talk to her...." While it is not absolutely clear that defense counsel was referring to Prattes' initial inquiry to Ramsey about making a statement, we are persuaded that in the context of Ramsey's other arguments to the court at the hearing, defense counsel was referring to this inquiry.

**4.** Decisions of the former Fifth Circuit, handed down prior to October 1, 1981, are binding precedent in this circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**5.** We need not address whether the agents waited a "significant period" before beginning another round of questioning both because the government does not raise this issue and because we have held that twenty minutes is not a sufficient period to wait, *Jacobs*, 952 F.2d at 1293.

he did not want to talk to Prattes or that he did not want to talk to any agent. The agents simply assumed that Prattes was the only agent with whom he did not wish to speak. Instead of clarifying Ramsey's equivocal invocation of his right to silence, the agents encouraged him to make a statement within twenty to thirty minutes of his equivocal invocation. Jordan's statement to Ramsey that this was Ramsey's opportunity to help himself and that Jordan would explain to the United States Attorney's Office the extent of Ramsey's cooperation was interrogation, *United States v. Johnson,* 812 F.2d 1329, 1331 (11th Cir.1986) (officer's statement to suspect that cooperation would be beneficial was interrogation); *Montana,* 958 F.2d at 518 (officer's statement to suspect that cooperation would be brought to attention of United States Attorney constituted interrogation), and was impermissible after Ramsey had invoked his right to remain silent. Since the statements made by Ramsey in response to this impermissible interrogation were tainted by the interrogation, the district court erred in denying Ramsey's motion to suppress.

 While the government contends that any error by the district court in failing to suppress Ramsey's custodial statements is harmless, we disagree because the government did not "prove[ ] beyond a reasonable doubt that the admission of the statements did not contribute to the verdict obtained," *United States v. Pena,* 897 F.2d 1075, 1082 (11th Cir.1990); *see also Arizona v. Fulminante,* —— U.S. ——, ——, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991); *Satterwhite v. Texas,* 486 U.S. 249, 258–59, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988) ("The question [ ] is not whether the legally admitted evidence was sufficient to support the death sentence, ... but, rather, whether the State has proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."). The evidence of possession and distribution was circumstantial without Ramsey's statements. The only evidence of possession was Ramsey's nervousness and a bulge below his waist that was not present later when a package of cocaine consistent with the bulge was discovered twenty-five to ninety feet from him in a limited access area. Without Ramsey's statements, the only evidence of distribution was the presence of a quantity of cocaine inconsistent with personal use.

### III. CONCLUSION

Because the DEA investigators violated *Miranda* by continuing to interrogate Ramsey after he had made an equivocal invocation of his right to remain silent, the district court committed error in admitting the statements Ramsey made immediately after the *Miranda* violation. The error was not harmless because the government failed to prove beyond a reasonable doubt that the statements did not contribute to Ramsey's conviction. Since this error requires reversal of Ramsey's conviction and a new trial, we need not reach his arguments regarding the stricken testimony of a witness and the constitutionality of sentencing for crack cocaine.

REVERSED and REMANDED.