**Otha TAYLOR, # 93763, Petitioner,**

v.

**Superintendent Walter RIDDLE, Respondent.**

**Civ. A. No. 75–0213.**

United States District Court,
W. D. Virginia,
Roanoke Division.

Feb. 2, 1976.

Otha Taylor, pro se.

Gilbert W. Haith, Asst. Atty. Gen., Richmond, Va., for respondent.

## OPINION AND JUDGMENT

DALTON, District Judge.

Otha Taylor, an inmate at the Virginia State Penitentiary, brings this *pro se* petition for a writ of habeas corpus. In his Answer respondent asks for dismissal of the petition. Petitioner questions the admissibility of certain evidence allegedly illegally elicited from him after his arrest. There being no question regarding exhaustion of state remedies, the Court addresses itself to the merits of petitioner's claim.

Petitioner was arrested in the early morning hours of September 2, 1969, for the murder, on August 30, 1969, of one Samuel Campbell. On December 2, 1969, in the Circuit Court of Roanoke County, Sheriff O. S. Foster testified before a jury as follows:

. . . At approximately One O'clock that night, or shortly thereafter, Mr. Taylor was arrested by the Police Department in Roanoke. Officer Greenway and I proceeded to the Police Department in Roanoke where Mr. Taylor was being routine [sic] processed, taking fingerprints and things of this nature, by the Police Department in Roanoke. And when this was completed, he was taken before Judge Alexander, who was present there in his office at the Municipal Building, and he was advised of his rights, and also the charges that were being placed against him. After the charges were read and a copy of the warrant was served on Mr. Taylor, he was asked to accompany Officer Greenway and I to the Roanoke County Jail. After he was put in the rear of the patrol car, he was again advised of his rights by me.

Q. What did you tell him?

A. I advised him that he did not have to make any statements at all regarding the charges that were against him, that if he did make any statements they could be used for or against him, depending on the nature of the statement—in Court; and he was entitled to have an attorney, and if he could not hire an attorney, himself, one would be employed by the State to represent him. _ _ _ We arrived at the Docket Office approximately, I would say, at 2:20 or about 2:25 a. m., and at approximately 2:30 I received a phone call in the outer office _ _ there are two offices at the jail, one is a dispatch center. The the rear of this office is a process room. I was in the dispatch center in answer to a phone call, when a certain matter was called to my attention by Officer Greenway. I went into the room occupied by Mr. Taylor, and he had on his fingernails what appeared to be blood. I called this to the attention of Mr. Taylor—

Q. What did you say to him?

A. I told him he had what appeared to be blood on his fingernails.

Q. You told him this?

A. Correct. He said that he had gone into the house occupied by Mr. Campbell and was attempting to help Mr. Campbell change the linen on his bed, and that's how he got the blood on his fingernails. He said he was unable to locate any linen and that he then went on to bed, and I said to Mr. Taylor: "Do you mean to tell me that you went to bed after seeing all the blood on Mr. Campbel?" Mr. Taylor replied: "You've done asked me a question I can't answer." I then asked Mr. Taylor about the gun that was found in his room, and he said that he got this gun from under Mr.

Campbell's pillow and took it into his room because he was afraid Mr. Campbell would shoot him. I then asked him if he didn't see all of this blood that was on Mr. Campbell, and he said: "Yes, but that he was all right when he left him to go to bed." Mr. Taylor said that he slept in his room that night and spent the night in his room, and that he got up the next morning and left the house without looking in Mr. Campbell's room to see if he was all right.

Q. He said he got up the next morning and did not even look in to see—

A. Correct.

Q. At the time that you advised Mr. Campbell _ _ Mr. Taylor of his rights, did he appear to know what you were doing?

A. It's an assumption on my part, but he didn't seem to have any difficulty understanding the statements that were made to him. I assume that he did, there was not force, coercion or things of this nature.

Q. No threats were made to him?

A. No, sir.

Q. And his response to you was _ _ you did not ask him about the blood, you pointed it out to him initially?

A. Correct, I told him he had what appeared to be blood on his fingernails.

Transcript, at 71–74.

This testimony was not refuted and no supplemental testimony relating to the above conversation was introduced by either side. The following issues appear from the excerpt: [1]

1) Did petitioner ever invoke his right to silence guaranteed him by the V Amendment to the Constitution as stated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)?

2) Did Sheriff Foster's testimony relating to petitioner's statement— "You've done asked me a question I can't answer."—represent an admission into evidence of petitioner's exercise of his right to remain silent, which is prohibited by *United States v. Moore*, 484 F.2d 1284 (4th Cir., 1973) and *United States v. Ghiz*, 491 F.2d 599 (4th Cir., 1974)?

I

■ The Supreme Court, in *Miranda*, stated:

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.

*Id.*, 384 U.S. at 473–4, 86 S.Ct. at 1627, 16 L.Ed.2d at 723.

But how does the individual indicate his wish to remain silent? Or, how does he waive his right to silence? It would certainly crystallize the issue if he made an oral or written statement that he understood his rights and either wished to remain silent and not answer any questions, or that he voluntarily waived his rights and would make a statement. Law enforcement authorities would, at that point, be aware of the legitimacy of further interrogation. But what if no immediate indication is made by the accused as to whether he wishes to remain silent or make a statement? *Miranda* is of some aid in this regard:

. . . [A] valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.

*Id.*, at 475, 86 S.Ct., at 1628, 16 L.Ed.2d, at 724.

This language only speaks to the proposition that silence cannot lead to a presumption of waiver. It does not say that silence creates a presumption that the used desires further interrogation to cease. So there appears to be an uncharted area of the law as to what silence

1. A review of the transcript indicates that the admission of the above evidence could in no way be considered harmless error, if its admission is considered error.

means. *Miranda* only states what it does not mean. Because of this void factors concerning silence bear close consideration.

The excerpt from the transcript, set forth above, indicates a very short period of time between the notification of rights by Sheriff Foster and his statement to petitioner regarding blood on his fingernails. Additional testimony by Sheriff Foster was taken in chambers and was not given before the jury. It sheds additional light on the time factor involved in this case:

Q. And you were outside [the Roanoke City Municipal Building], and you had just taken him out and put him in the patrol car, and what happened then?

A. I advised him of his rights. . . I did not at that time attempt to solicit a statement from Mr. Taylor while he was in the patrol car, my primary reason being, of course, that if he made any statement, I wanted to be able to record it. We did carry on a general conversation, I'd say of a general nature, en route to Roanoke City __ to the Roanoke County jail.

.    .    .    .    .

At the jail he was asked if he desired to make a statement __ at that time he did not make any statement.

Q. Did he say anything?

A. He didn't say anything, according to my recollection now. When I __ while I was processing him, I received a call  .  .  . .

Transcript, at 54–5.

From the two excerpts the Court finds the following facts to be undisputed: 1) that from the time Sheriff Foster advised petitioner of his rights until Sheriff Foster asked him if he wished to make a statement, there was no attempt to solicit a statement from petitioner and no indication from petitioner as to whether he would stand on his rights or waive them; 2) that a period of not more than ten minutes (2:20 to 2:30 a. m.) elapsed between the time petitioner was asked if he wished to make a state-

ment and the time Sheriff Foster was interrupted by a phone call; 3) that during this interval Sheriff Foster was involved in routine processing of petitioner and made no efforts to elicit a statement; and 4) that upon completion of his telephone call Sheriff Foster made a remark, which the Court will consider an attempt to determine whether petitioner actually wished to remain silent. The result of that remark was petitioner's statement.

The key to *Miranda*, as it relates to this case, appears to be the indication by the accused of his desire to remain silent. *Michigan v. Mosley*, 423 U.S. 96, at 102, 96 S.Ct. 321, 325, 46 L.Ed.2d 313 (1975). This could also be stated as the decision by the accused to remain silent. *Id.*, at 104, 96 S.Ct. at 326, 46 L.Ed.2d at 321. The actual act of being silent after being advised of one's rights and asked to make a statement does not necessarily indicate a desire or decision to remain silent. There exists the possibility that the individual is actually undecided as to whether to cooperate or not. He may be weighing the possibility of cooperation in order to lessen the severity of possible punishment; or he may be curious as to what incriminating evidence the prosecution already has; or he may be formulating his alibi. Any of these thoughts might result in silence with the actual hope that the law enforcement authorities might tip their hand a bit by indicating what evidence they possessed. *Id.*, White, concurring, fn. 1, at 109, 96 S.Ct. at 329, 46 L.Ed.2d at 325. Such an indication would issue forth by means of a statement by law enforcement authorities.

The question thus posed is this: If that statement by law enforcement officials is issued within a short period after a request for a statement from the accused goes totally unanswered, should the response to that statement be withheld from a jury as a violation of *Miranda* because the accused's short period of silence cannot be presumed as a waiver? The logical answer is: Only if it follows that the silence creates a correlative pre-

sumption that the accused has decided to invoke his V Amendment rights. Since *Miranda* says no such thing, it seems logical to allow law enforcement authorities to ascertain whether a decision to remain silent has been made. A gentle probe—to determine whether the silence of the accused indicates a decided intention to so remain, or whether it is a thoughtful silence, mulling over the merits of cooperation versus silence—should not be prohibited. The gentle probe, in all fairness to the accused, could only be a one-shot effort. If no response is forthcoming, interrogation should be cut off, with the realization that the accused has probably opted for silence. Such a probe would in no way "undermine the will of the person being questioned." *Michigan v. Mosley, supra*, at 102, 96 S.Ct. at 325, 46 L.Ed.2d at 320. Indeed, it might very well elicit a clarification from the accused as to whether he wishes to remain silent or make a statement. Then the problem would be solved.

■■ This Court feels that *Miranda* only prohibits a presumption of waiver from silence. It does not mandate complete cessation of interrogation, if that interrogation is only for the purpose of determining whether the accused wishes to invoke his right to silence. Nor does this Court require that the inquiry into whether silence is the course adopted by the accused be restricted to a question involving the right to remain silent. The question or statement may bear on evidence pertaining to the crime which the individual is accused of committing, as in the case before us. The nature of the question or statement is not important. The accused has already been advised of his rights. If he does not wish to respond, he will so indicate, regardless of the question or statement put to him. If a response is made to the question or statement, it may be used against the accused. If silence continues, or if an affirmative desire to have interrogation cease issues from the accused, then all questioning should cease.

The facts of this case are analogous to those in *United States v. Hayes*, 385 F.2d 375 (4th Cir. 1967), *cert. denied*, 390 U.S. 1006, 88 S.Ct. 1250, 20 L.Ed.2d 106 (1968). There Judge Sobeloff, after reciting the facts surrounding the arrest and interrogation, stated:

Against these telling circumstances, the appellant offered no evidence. He produced no witnesses putting in question his apparent intellectual endowments. Moreover, it is noteworthy that at no stage in the proceedings has the appellant ever denied that he understood the warnings given him, and while a defendant does not have the obligation to testify himself or to offer testimony, a court cannot supply evidence that is lacking.

*Id.* at 378.

The facts in *Hayes* were not substantially different than in the case under consideration, therefore the court considers *Hayes* controlling.

■ Applying this reasoning to the circumstances of the case before this court, it is concluded that Sheriff Foster's statement regarding blood on petitioner's fingernails constituted the "gentle probe" which Foster hoped would provide some indication as to whether petitioner wishes to remain silent or to make a statement. Petitioner's response to the statement indicated that he was at least initially willing to discuss his case—that he would not, at that time, refuse, on the basis of the V Amendment, to answer questions. *Hayes, supra*. Therefore, the evidence introduced by Sheriff Foster was admissible and was properly before the jury.

II

The second issue before the Court is whether Foster's testimony relating to petitioner's statement—"You've done asked me a question I can't answer."—represents prosecutorial comment on the accused's V Amendment right to remain silent. "Federal courts have long excluded any prosecutorial comment on a defendant's failure to testify in his own behalf. *Wilson v. United States*, 149 U.S. 60 [13 S.Ct. 765, 37 L.Ed. 650]

(1893)." *United States v. Moore, supra,* at 1285. This exclusion was extended to State authorities by means of the XIV Amendment in *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). The Supreme Court has further extended this protection in the following language:

In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation.

*Miranda, supra,* fn. 37, 384 U.S., at 468, 86 S.Ct., at 1625, 16 L.Ed.2d at 720.

The Fourth Circuit has described the protection in the following language:

Therefore, if Moore had remained altogether silent, or if in declining to answer certain questions he had invoked his Fifth Amendment privilege, or if in any other way he had indicated he was relying on his understanding of the *Miranda* warning, evidence of his silence or of his refusal to answer specific questions would have been inadmissible.

*United States v. Moore, supra,* at 1286; accord, *United States v. Ghiz,* 491 F.2d 599, 600 (4th Cir. 1974).

It seems clear that before this protection can be invoked the refusal to answer must clearly be a result of an exercise of the accused's V Amendment right to be free from making self-incriminating statements. A simple inability to answer a question without any evidence that the inability represents an effort to invoke the right to silence based on *Miranda* need not be withheld from a jury on the basis that it represents comment on the exercise of one's V Amendment right against self-incrimination. Since the right has not been invoked, admission of the statement could not possibly represent comment on the invocation of the right.

The Court finds no error of constitutional magnitude in the admission of pe-titioner's statement before the jury, because there is no indication that he was invoking his V Amendment right to silence when he made the statement.

The Court is of the opinion that the petition should be and hereby is denied. The case is dismissed and ordered removed from the docket. Petitioner is advised that he may appeal this decision to the Fourth Circuit Court of Appeals within thirty (30) days of the date indicated below.

The clerk is directed to send a copy of this decision to petitioner and to counsel for respondent.